Filed 3/7/14  P. v. Ortiz CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B243676 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA111325) |
| v. | |
| ANASTACIO ORTIZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Raul A. Sahagun, Judge.  Reversed in part, affirmed in part, and remanded.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Anastacio Ortiz (defendant) appeals his conviction of 11 counts of sex crimes against three victims. Defendant contends that the sentences for five of the counts (1 through 4 and 18) were prohibited under the ex post facto clauses of the federal and state constitutions. Defendant also contends that the trial court erred in denying his motion to disclose juror information, in denying his motion for new trial based on prejudicial juror misconduct, and in excluding some testimony by the defense expert on child sexual abuse accommodation syndrome (CSAAS). Finally, defendant contends that the prosecutor committed misconduct in summation. We agree that the sentence on count 18 must be vacated and the matter must be remanded for resentencing under prior law, but finding no merit to defendant's other contentions, we affirm the judgment in all other respects.

## BACKGROUND

### Procedural history

After defendant's first trial ended with a hung jury, the trial court declared a mistrial and dismissed several counts. The prosecution then filed a third amended information charging defendant with 15 crimes against three minor victims, V., A., and An.[1]

The third amended information charged defendant with committing 12 crimes against V.: four counts of lewd acts upon a child under the age of 14 years, in violation of Penal Code section 288, subdivision (a),[2] committed between 2003 and 2007 (counts 1, 2, 3, and 4); two counts of lewd acts upon a child 14 or 15 years old while defendant was at least 10 years older, in violation of section 288, subdivision (c)(1) (counts 11 and 12); two counts of sexual penetration by a foreign object upon a victim under the age of 16 years while defendant was over 21 years, in violation of section 289, subdivision (i) (counts 13 and 22); two counts of oral copulation of a person under 16 years while

---

[1] The counts which remained were 1 through 4, 11 through 16, 18 through 20, and 22 through 23.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

2

defendant was over 21 years, in violation of section 288a, subdivision (b)(2) (counts 14 and 23); one count of penetration by a foreign object upon a victim under 18 years, in violation of section 289, subdivision (h) (count 15); and one count of oral copulation of a person under 18, in violation of section 288a, subdivision (b)(1) (count 16).

Defendant was charged with committing the following two crimes against A.: one count of the continuous sexual abuse of a child under the age of 14 years (count 18), in violation of section 288.5, subdivision (a); and one count of committing a lewd act upon a child under the age of 14 years (count 19) in violation of section 288, subdivision (a).

Defendant was charged with committing one crime against An.: a lewd act upon a child under the age of 14 years (count 20), in violation of section 288, subdivision (a). In addition, the third amended information alleged multiple victim circumstances as to counts 1, 2, 3, 4, 18, 19, and 20, within the meaning of sections 667.61, subdivision (b), and 1203.066, subdivision (a)(7).

Defendant's second jury found him guilty of counts 1, 2, 3, 4, 11, 12, 13, 18, 19, 20, and 22 as charged, and not guilty of counts 14, 15, 16, and 23 (all involving V.). The jury found true the multiple victim circumstances as alleged in counts 1, 2, 3, 4, 18, 19, and 20.

On July 20, 2012, after denying defendant's motion for a new trial and other posttrial motions, the trial court sentenced defendant to a total term of 105 years to life in prison, comprised of the following: 15 years to life as to count 1; a consecutive term of 15 years to life for each of counts 2, 3, 4, 18, 19, and 20; and concurrent middle terms of two years each for counts 11, 12, 13, and 22. The trial court also ordered defendant to pay mandatory fines and fees, register as a convicted sex offender, and undergo AIDS testing. Defendant was awarded 1,274 days of custody credit. Defendant filed a timely notice of appeal.

**Prosecution evidence**

*V.*

Nineteen-year-old V. testified that as a child she lived with her mother G., her brother Edgar, who was two years older, and her two younger siblings. V.'s extended

3

family on her mother's side was large and close knit: G.'s four sisters were Gloria, Viviana, Marisol, and Yesenia; her two brothers were Alvaro and Miguel; and V.'s grandmother was Isabel.[3] Gloria's two sons were Eric and Argenis, and her three daughters were A., who was four years younger than V., and twins An. and Emily, who were nine years old at the time of trial. Marisol had been married to defendant since V. was a baby and their children were Anthony and Thomas, both younger than V. V.'s uncle Alvaro had five children, including his daughter Alyssa, who was four or five years younger than V. Defendant had two daughters from a previous relationship: Rebecca, who was V.'s age, and Valerie, who was older by a year or two.

V. testified she was especially close to her Aunt Marisol and beginning when she was six years old and in kindergarten, she and her brothers spent alternate weekends with Marisol and defendant at their home in Lake Elsinore. Defendant and the children would all sleep on the living room floor while Marisol slept in the bedroom. During the night, V. became aware of defendant next to her, rubbing her buttocks and breast area. Once defendant held her hand and used it to rub his penis. During such times defendant would say nothing and V. pretended to be asleep. Because she was frightened and felt guilty she did not struggle and told no one about defendant's behavior. V. testified that defendant continued his nighttime behavior throughout her kindergarten year, and once he pulled down her pajama bottoms and licked her vagina.

Sometime later, defendant and Marisol moved to Lynwood, to a back house on property owned by V.'s grandmother Isabel. V. slept on the floor there and defendant did things to her there too, but she could not remember that period well. In 2001, when V. was in the third grade, Marisol and defendant lived in a converted garage behind a main house in Carson. V. was still closer to Marisol than her own mother, and visited almost every weekend. At times when her brother Edgar, their cousins, and defendant's daughters visited, as many as 10 children slept on the floor of the Carson house. Defendant always slept next to V. and continued to sexually abuse her almost every time

---

[3] We refer to all minors, victims, their friends, and family members by their first names to avoid confusion as many of them share a surname.

4

she stayed over, by rubbing her body over and under her clothes, touching her vagina, or removing her shirt and massaging her. V. continued to pretend to be asleep, and defendant never said anything. When they were awake, defendant treated V. with favoritism, causing his own daughters to appear to be jealous. Defendant tried to hold V.'s hand when they were in the car, and often told her he loved her.

Marisol and defendant separated for a while when V. was 12 or 13 years old, when she was in the sixth or seventh grade. Defendant moved in with his sister, Lupe, and V. spent one night there, along with defendant's sons and daughters. V. slept on an air mattress and defendant slept on the floor next to her. During the night, she woke up startled by something vibrating between her thighs. The vibration came from a purple object which defendant used to rub her leg. V. did not know what the object was then, but later realized that it was a dildo.

When defendant and Marisol reconciled they moved to a two-bedroom house in Downey. During that time V. was in the seventh and eighth grades, and was 13 and 14 years old. Although Anthony and Thomas had their own room, V. and the boys slept on the living room floor when she visited, and sometimes her cousin A. was there. Once, during the night at the Downey house, V. saw A. lying on top of defendant under the covers. V. suspected that defendant was doing something to A., but did not stop him or tell anyone.

Defendant continued the same nighttime behavior at the Downey house, touching and rubbing V.'s breasts over and under her clothing, and touching and licking her vagina. The other children in the room never seemed to be awake. In Downey, defendant also began kissing V. on her lips and telling her that he loved her. V. continued to pretend she was asleep although she was "grossed out" by his kisses. Defendant also began hinting at his behavior and asking how it felt, but V. would "play dumb" by acting as though she did not know what he was talking about. V. was still too frightened to tell Marisol about defendant's behavior.

In January 2007, while defendant and Marisol still lived in Downey, defendant took V. shopping for clothes for her 14th birthday. Defendant spent a large amount of

cash, and told V. not to say anything about the cash purchases. After that, defendant occasionally gave V. money without Marisol's knowledge. V. began babysitting Anthony and Thomas regularly that year, at defendant's request. V. was reluctant, but her mother insisted she help.

Marisol and defendant moved to Norwalk in 2007 when V. was a freshman in high school. Defendant occasionally asked V. to accompany him on errands, and then held her hand and kissed it, and told her that he loved her. The nighttime touching continued to occur every time she slept over, about every other weekend. It was in the Norwalk house that defendant began inserting his fingers into her vagina, which he then did frequently. About one month after defendant moved to Norwalk, he attempted to insert his penis into V.'s vagina. V. scooted back when it hurt her and he stopped, but continued to caress her. On another night, defendant tried again, telling V. it was okay and would be quick, but was again unable to penetrate her. V. got up and went to the boys' room for the rest of the night. V. was "really scared" and did not tell anyone about it.

Defendant then made a third attempt when V. was still 14 years old. They were again sleeping on the floor in the same room as Anthony and Thomas, and defendant began by rubbing V. under and over her clothes and inserting his fingers in her vagina. This time he put something "gooey" on her vagina as he said "third time's a charm," and "it's not going to hurt." Defendant was able to insert his penis all the way in and kept it there for several minutes until V. pulled away due to pain. She went to the bathroom where she realized she was bleeding slightly. The next day V. acted as though everything was normal; once again, fear prevented her from saying something to Marisol. V. testified that defendant became very possessive after that, insisting that she cancel plans so she could babysit, demanding to know who she was "texting," and then "freak[ing] out" if she gave a male name, and forbidding her from talking to "guys" because she was too young.

Defendant did not try to penetrate V. again, but continued his other sexual behavior. If V. resisted him, defendant would be mean to her all the next day. V.

6

became more reluctant to go to defendant and Marisol's home, but her mother would say she was obligated to babysit. Beginning in January 2008, after V. turned 15, defendant continued throughout that year to rub her breasts, touch her vagina, insert his fingers, lick her vagina, and kiss her on the mouth when she spent the night, unless she slept in the boys' room, which she did whenever possible.

In April 2009, when V. was 16, her mother wanted her to have a physical examination. V. and her mother were not getting along well at this time. Afraid that G. wanted to determine whether she was still a virgin, V. fled to her paternal aunt's house in Long Beach and telephoned her father, C., who lived in Riverside. Thereafter V. went to live with C., where she stayed through the end of summer school. Following the recommendation of a family court judge, C. placed restrictions on V., including no cell phone use until her grades improved. V. did not mention defendant's abuse during this time.

In June 2009, before her cell phone restriction had been lifted, V. went to Marisol and defendant's home for the weekend in order to visit friends who lived nearby, including her friend Karina. Late that Saturday night, around 12:30 or 1:00 a.m., V. used defendant's cell phone in the den. While she was texting and talking, defendant came into the den, became angry and aggressive, told her she was not allowed to use the phone, and demanded to know why she was using it, who she was talking to, and whether it was a guy. Defendant accused V. of lying when she said it was a girlfriend, continued to question her, and finally took the phone away and left the room. The next day defendant acted like a "mad boyfriend" by speaking to V. in a rude tone or ignoring her and acting very possessive. Defendant complained to Marisol about V.'s cell phone use and cancelled her plans for a photo shoot with her girlfriends. V. became very angry and decided to disclose everything so she could move on with socializing with friends and dating. Not wanting to hurt Marisol, V. confided in her Aunt Viviana when she came to visit.

Later that night V. and her father met her mother and stepfather at a police station in Norwalk. A deputy interviewed V., and the following Monday a detective came to her

7

school and interviewed her there. Among other things, V. told the detective that defendant occasionally spoke about her cousin A., saying that A. was jealous of her, and describing sexual things he had done to her (that V. could not remember), adding, "[A.] likes when I do this." V. added that one time, before defendant had penetrated V., he said it was easier with A., that she was "all for it"; he also said that because it did not hurt her, he did not think A. was a virgin, and that her brother must have been "messing around" with her.

V. also testified that she was 14 years old when defendant penetrated her, and that was the first time anyone had inserted a penis into her. She was 15 or 16 years old when she first had consensual sexual intercourse in the course of a relationship that lasted about four months and ended before she disclosed defendant's abuse in June 2009. That relationship was not with Randy, her recent ex-boyfriend.

*A.*

A., four years younger than V., was 15 years old at the time of trial. Her birthday was October 24, 1996. A. moved to Arizona in the fourth grade, when she was nine years old, and still lived there with her mother, Gloria, twin nine-year-old sisters, Emily and An., and her older brothers Eric and Argenis. Marisol and G. were her aunts.

A. remembered sleepover visits with Marisol at her homes in Carson, Lynwood, Downey, and Norwalk. A. was still living in California when Marisol and defendant lived in the Carson house, where defendant touched her breast and buttocks for the first time while she was visiting overnight. A. felt awkward about the incident and did not tell anyone. Cousins Giovanni and Miguel were usually there, and sometimes so was V. They slept on the floor of the living room and during those times defendant touched her breasts, buttocks, and more than twice, her vagina. Before A. moved to Arizona, defendant had touched her inappropriately more than three times on three different nights. In all, he touched her inappropriately more than five times. A. also remembered visiting Marisol and defendant overnight at the Downey house many times, but could not remember whether she had already moved to Arizona at that time or her age. She

8

recalled one inappropriate touching which occurred at her grandmother's Lynwood house before she moved to Arizona.

A. was not sure how old she was during her visits to the Norwalk home. She visited there more than once, and slept on the living room floor with her sisters, the boys, and defendant. During the night, defendant touched her breasts, buttocks, and sometimes her vagina. Defendant did not touch her every time she spent the night, but it was more than once, and always at night in the living room. Once, when A. did not let defendant touch her, he became angry and stopped talking to her.

One night in Norwalk, defendant's sexual behavior woke her. She moved, but he followed her until she kicked him. She remembered that it was in the Norwalk house because she was wearing a pink blouse and pink shorts, and the following morning she discovered she had urinated on herself. Another time, while Giovanni, Anthony, Thomas and other cousins were in the living room at night, defendant rubbed her vagina and asked whether he could put "it" inside her. A. could not remember his exact words, but understood him to mean his penis; when she said no, defendant told her that he had done it to V. A. could not remember how many times this happened or whether she was younger or older than 12 on the other occasions. She recalled that she was 12 years old when she told defendant not to touch her anymore or she would tell Marisol. A. kept silent about defendant's conduct until after V. revealed defendant's behavior.

### *An.*

A.'s sister An. was nine years old at the time of trial. She testified that after moving to Arizona she would visit California, staying with one of three aunts, including Marisol. At Marisol's home she slept on the living room floor with her sisters and defendant. When she was six years old she spent a week there at Christmastime. At night, defendant touched her "in the private" which she defined as the area she used to go to the bathroom. An. did not say anything, and tried to scoot to the side, but defendant held her down. Defendant did the same thing on two more nights, three times altogether. An. said nothing to her mother, but asked to sleep with her instead of with the others.

9

An. told her twin sister Emily about defendant's behavior after each occurrence, but did not tell her mother until after the detective called.

### *Testimony of Rebecca, Edgar, Gloria, Viviana, Alyssa, and C.*

Defendant's daughter Rebecca testified that she was V.'s age, also born in January 1993, and that she recalled overnight visits with defendant and Marisol in Lynwood around the time she was in the fifth grade. Her sister, cousins and she all slept on the floor in the same room. When V. was there, Rebecca did not see anything unusual at night. During the day, however, defendant showed favoritism toward V., and was more affectionate with her and A. than with his daughters. He hugged V. more, he would have V. and A. sit in his lap, and in the car, he would place his hand on V.'s lap. Rebecca felt left out.

V.'s older brother Edgar testified that he remembered overnight visits to defendant's homes in Carson, Lynwood, Downey, and Norwalk, when he, defendant, and other children, sometimes V., slept in the living room. Once, in the Lynwood house, when he was in the fifth or sixth grade, he was awakened around 3:00 a.m. by a shuffling noise and became aware of defendant and his sister next to him. After listening to the noise for 20 minutes, he went to the bathroom, and as he came back out, he saw V. leaving the living room with her pants unzipped, while defendant remained on the floor. The incident frightened Edgar, and he did not say anything about it at that time.

Edgar also testified that defendant paid more attention to V. than to his cousins and that he showed more affection to her and A. than he did to the other girls, giving them more hugs and kisses whenever he saw them. Defendant did not hug or kiss the male cousins at all. During Edgar's sophomore year of high school, when V. did not have a cell phone, defendant often called Edgar's phone and asked to speak to V. When Edgar was a senior, defendant asked him to be more protective of V., to be a better big brother. Once, at a family event Edgar and Argenis played a "pantsing" game in the swimming pool only with each other, and then Edgar saw defendant pull down V.'s bikini bottom.

10

A.'s mother, Gloria, testified that she moved to Arizona with her children and mother in 2006. A. had overnight visits with defendant and Marisol at their homes in Lake Elsinore, Carson, Downey, Lynwood, and Norwalk over the years. After the move to Arizona A. spent overnight visits at the home of defendant and Marisol at Christmastime 2007, in May 2009, during the summer of 2008, and during the spring of 2009. During the 2007 Christmastime visit A. repeatedly asked to sleep with Gloria in the boys' room without giving any reason. Gloria refused.

In June 2009, A. was asked whether defendant had molested her. She said no. When Gloria asked her again a few weeks later, A. said she did not want to talk about it. In 2010, after defendant was arrested, Gloria and her daughters came to California and stayed with Marisol in Norwalk. Marisol's private investigator spoke with A., who was angry, but when told what V. had said about her and defendant, she replied that V. was not lying, and began to cry. After Gloria questioned A. and the twins separately in Arizona, she brought the girls back to Los Angeles to speak with Detective Rudy Acevedo.

Viviana, the youngest sibling in the family, lived in their mother's Lynwood home since 2005. She testified that defendant and Marisol lived in the back house prior to moving to Lake Elsinore in 1999. After about two years in Lake Elsinore, when Viviana was about 16 years old, they moved to Carson and then back to the Lynwood house about five years prior to trial. Viviana could not recall when Marisol and defendant lived in Downey. Viviana saw V. when she visited in Lynwood, Carson, Downey, and Norwalk, and was able to observe defendant's interaction with her, noting that defendant was always very friendly with V., greeting her with hugs or kisses, although he did not do so with his other nieces and nephews. Viviana said V. was nervous, cried, told her that defendant had been molesting her since she was six, and said, "I lost my virginity to him."

V.'s younger cousin Alyssa was 15 years old at the time of her testimony. Alyssa was able to observe how defendant behaved toward V. and the other cousins during family get-togethers. She noticed that defendant would stand closer to V. when they

11

were all together. Once, at their grandmother's house in Lynwood, when Alyssa was nine or ten years old, she saw defendant place his hand around V.'s buttocks and rest it there. A few seconds later, defendant told Alyssa, the only other person in the room at the time, to leave. Alyssa felt intimidated and went outside to play. On several occasions, Alyssa rode in defendant's car while V. sat next to defendant. Once, a couple of years before trial, Alyssa saw defendant place his hand on V.'s upper thigh near her vagina, and rub it up and down in a caressing motion, while V. behaved normally. Alyssa never saw defendant do that or touch the buttocks of any other cousin. After defendant was arrested, Alyssa told her father, Alvaro, what she had seen, and later spoke to Detective Acevedo.

C. testified that after his separation from G. she retained custody of their two children, Edgar and V., and except for early in the separation, he saw them infrequently. Sometimes when he went to see them, they were not at home because they were with an uncle or aunt. C. placed restrictions on V. when she came to live with him in 2009, such as an early bedtime, no cell phone at certain times during the week, and preapproval of any visiting friends. However he did not monitor her calls and she had no telephone or other restrictions on the weekends. Before her last visit C. told defendant that the cell phone restriction applied on weekdays and he consented to V.'s planned photo shoot. V. moved back with her mother after completing her summer school course, about two weeks after the molestation disclosure.

**Dr. Jayme Bernfeld**

Dr. Bernfeld, a clinical psychologist, testified as the prosecution's expert in CSAAS, using the model formulated in the 1980's by Roland Summit to assist in understanding the dynamics of reporting child sexual abuse, and to explain the common expectation that children would immediately disclose such abuse. The model consisted of five categories: secrecy, helplessness, accommodation, delayed disclosure, and retraction (which was rare). Dr. Bernfeld explained that the model was not a diagnostic or predictive tool, and thus not designed to determine whether a child had really been abused or whether she had lied.

12

According to the model, keeping the abuse secret over a long period would make the child feel more and more guilty and less and less likely to report the abuse. The victim's helplessness was both physical due to the adult abuser's size, and psychological as a result of teaching children to do as adults say. Accommodation was often the result of the child's effort to make the abuse more tolerable, such as by pretending it was not happening, or by pretending to be asleep or somewhere else.

Dr. Bernfeld testified that contrary to the common expectation that children would disclose the abuse in a story format from beginning to end, disclosure was usually made in bits, a little here, a little more next time, often with differing details. This sometimes depended on the child's comfort level with the listener. Recent studies regarding delayed reporting showed that only about 20 percent of children disclosed their abuse during the first year, while 35 to 40 percent disclosed it between one and five years. Children found disclosure very difficult when the abusers were in a close relationship, not wanting to get them into trouble or interfere with the relationship; or they have been taught not to talk about sex or about bad things that happen within the family. Abusers might reinforce this reluctance by telling the child, for example, not to tell as telling would get her into trouble, or that no one would love her.

The two events found most like to trigger disclosure were adolescence and being asked directly. Also, children were likely to disclose abuse after a particularly intolerable occurrence or when they were particularly upset. Dr. Bernfeld explained that adolescents were better able to think critically and they tended to fight back against adults, seeing breaking a secret as a way to rebel. Even when asked directly, an embarrassed child might be brief or deny the abuse altogether. For example, in several studies of children with sexually transmitted diseases, up to 70 percent denied having been sexually molested.

13

**Defense evidence**

Although the defense called several witnesses, defendant's brief refers only to the extensive cross-examination of V. to show conflicts and differing details, and to argue that she demonstrated a bad character.[4]

Detective Acevedo testified that he interviewed V. in June 2009. He described some of the conflicts between her statements in the interview and her testimony. For example, she claimed that there were three instances of sexual penetration over one weekend when she was 14 or 15 years old, but did not report regular abuse over a period of years. In one interview, V. told him that she saw an off-white vibrator somewhere; later she told him about the use of a purple vibrating dildo. When he served a search warrant at the Norwalk house, Detective Acevedo did not find a vibrator or dildo.

V.'s friend Karina testified that she went to defendant's home for a barbecue and never observed any strange behavior between V. and defendant. Once, Marisol and defendant allowed Karina and another girlfriend to visit V. while she babysat. Marisol also allowed their male friend Joey to join them. Later, when they heard defendant's car, Joey ran out the back, and defendant and Marisol appeared to be upset with V. Although V. had ample occasion to do so, she never told Karina that defendant had done anything inappropriate to her or that anything unusual had gone on between them.

G. testified that V. ran away to a paternal aunt's home in Long Beach in May 2009, the day after they had argued about V.'s grades, behavior, and that G. was going to take V. to the doctor. When V. was found, she refused to go home with G. until the deputy sheriff insisted. Once home, however, V. was so upset that G. relented and allowed her to call her father. G. denied knowing about anyone named Randy until shortly after that event, denied that she told the deputy sheriff that V. had been dating an adult named Randy, and claimed that she said she saw the name "Cesar" in a note in V.'s

---

**4**     For example, to argue that V. was lying, defendant relies a great deal on her Facebook and MySpace postings shortly before and after disclosing the abuse, such as "Do what I gotta do so I can do what I wanna do"; and "I'm no angel. I have an ugly side. I'll lie and hurt people for the rest of my life. It's not my intention, but I can't help it."

14

room.  G. testified that later, when custody was given to V.'s father, the family court judge recommended that V. not be allowed to use a cell phone until her grades and behavior improved.  G. denied any knowledge of texts or calls to Randy over the July Fourth weekend, when V. came for a visit.

G. testified that defendant often asked V. to babysit, that V. was reluctant, and that G. convinced her to go because Marisol was very good to V.  Sometimes after defendant asked for V. to babysit, Marisol would tell G. that they had not needed a babysitter.

The defense also called Deputy Brandon Patin, who took G.'s missing person report on May 27, 2009.  He testified that G. said something vague about her belief that V. might be dating an adult named Randy, and about finding notes written by V. mentioning him.  G. did not mention a person named Cesar.  Once she was found, Deputy Patin tried to question V., but she was uncooperative and said little.  V. did not say she had been abused.

Defendant's son Anthony was 14 years old at the time of trial.  He testified that he was in the fourth grade when they moved from Downey to Norwalk, and that they lived in Lynwood before Downey.  He said defendant had a back problem that always hurt, and he described the sleepovers attended by his cousins and half-sisters.  Defendant slept either in his own room or on the living room floor with all the children.  Anthony usually slept in the living room with the others.  In the Norwalk house V. usually slept in the den, not with the other children in the living room.  Anthony never saw defendant treat V. differently from his other cousins or behave toward her in any inappropriate way that seemed sexual.  He rode in the car with her many times and never saw defendant hold V.'s hand or touch her in a bad place.  When defendant bought V. clothes for her birthday, Anthony did not see it as a sign of favoritism; defendant bought all the cousins presents on their birthdays.  V. never said anything to Anthony that led him to believe that defendant was hurting or molesting her in any way, and he never saw anything improper.  Defendant kissed V. on the forehead, although he did not kiss the other cousins.  Anthony recalled that when he went with defendant and his brother to pick up V. from C.'s house, he heard C. say that V. was grounded and not to use her cell phone.

15

Clinical psychologist Dr. Jeffrey Whiting testified as the defense expert in area of CSAAS. He was familiar with Summit study, which he found helpful in understanding delayed disclosure and retraction by children proven to have been abused. He explained, however, that the model was neither diagnostic nor predictive, but rather a theoretical concept that was not based upon empirical research. Thus, although the model can explain the behavior of children who have been abused, the same behavior might be seen in children who have not been abused. Thus, delayed reporting and inconsistent versions could be consistent in some cases in which the child was fabricating.

Deputy Sheriff David Perry took the initial report from V. at the Norwalk Station on June 28, 2009. He did not take notes, but wrote the outline of the report during the hour and a half interview. V. appeared to be in shock, scared, and nervous, and her parents were upset and excited. Deputy Perry had never been assigned to an investigative unit and had never been trained to conduct an interview of a sexual assault victim. V. reported that she had been molested by her uncle approximately twice a month over a period of eight years, beginning when she was six years old and defendant lived in Lake Elsinore. She said it usually happened in the living room on the couch or floor; that defendant began by fondling her breast area and her inner thigh area; and that later he would pull down her pajama bottoms and underwear and penetrate her with his fingers. She did not mention oral copulation or licking. One year before the interview, defendant began attempting to insert his penis inside her, and was successful the third time he tried. She said his penis was in her vagina for 10 to 15 minutes and that he did not ejaculate. This behavior was then repeated twice a month for approximately one year at the residence in Norwalk. Deputy Perry did not recall any mention of lubricant or a dildo. V. told him that defendant had molested her cousin A. as well. She said that defendant had bragged about his inappropriate conduct with A. and had said that A. was "all over him." When defendant drove V. home he would ask her "how she liked it."

Nurse practitioner Elsie Alfaro prepared a report following a sexual assault (SART) exam of V. on July 28, 2009, consisting of V.'s history and physical exam. V. told her that no lubricant had been used, and that she was sexually active with someone

other than defendant, but not in the five days prior to the exam. Nurse Alfaro's physical findings were consistent with a teenager who had been sexually active over a period of time. It was a "normal exam" which meant there was no evidence of acute injury and no evidence of old injury, and Nurse Alfaro could thus neither confirm nor negate sexual abuse.

## DISCUSSION

### I. Ex post facto: count 18

Defendant contends that his sentence of 15 years to life on count 18 was unauthorized and resulted in ex post facto punishment, because he was sentenced under a version of section 667.61, the so called "One Strike" law (*People v. Mancebo* (2002) 27 Cal.4th 735, 738), which took effect September 20, 2006, prior to the times he was shown to have committed the alleged crimes.[5] Defendant's contention has merit.

Count 18 alleged the continuous sexual abuse of a child under the age of 14 years, in violation of section 288.5, subdivision (a), committed between October 24, 2001 and October 23, 2007, with the circumstance that defendant had committed sex crimes against multiple victims, within the meaning of section 1203.066, subdivision (a)(7). A jury convicted defendant as charged and found true the multiple victim allegation. The trial court sentenced defendant to 15 years to life under former section 667.61, subdivisions (b) and (e)(5).

Ex post facto laws are prohibited by both the California and United States Constitutions. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) An ex post facto law is a statute that punishes as a crime an act which was not a crime when committed, or that inflicts greater punishment than permitted by the law applicable when the crime was committed. (*Collins v. Youngblood* (1990) 497 U.S. 37, 42-43.) Thus, an amendment

---

[5] Respondent concedes that an ex post facto violation resulting in an unauthorized sentence under section 667.61 may be raised on appeal even though defendant failed to object below. (See *People v. Hiscox* (2006) 136 Cal.App.4th 253, 258 (*Hiscox*), citing *People v. Zito* (1992) 8 Cal.App.4th 736, 741-742.)

17

that increases the punishment associated with a crime after its commission is prohibited. (*People v. Acosta* (2009) 176 Cal.App.4th 472, 475.)

In relevant part, the One Strike law requires a 15 years to life term for a defendant "convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e)." (§ 667.61, subd. (b).) The multiple victims circumstance was specified in former subdivision (e)(5) at the time defendant was sentenced, but prior to September 20, 2006, section 288.5 was not an offense enumerated under subdivision (c). (See Stats. 1998, ch. 936, § 9.) A violation of section 288.5 was added to the list by amendment effective September 20, 2006. (See Stats. 2006, c. 337, § 33.) Without the application of section 667.61, subdivision (b), the punishment for a violation of section 288.5, was and is a term of imprisonment of 6, 12, or 16 years. (§ 288.5, subd. (c); see Stats. 1989, ch. 1402, § 4, amended by Stats. 2006, ch. 337, § 8.)[6]

The prohibition against ex post facto laws precludes sentencing under section 667.61 for crimes committed prior to its enactment in 1994. (*People v. Alvarez* (2002) 100 Cal.App.4th 1170, 1178.) As defendant argues, it follows that the prohibition applies to the 2006 amendment, which increased the punishment for a violation of section 288.5 when committed under specified circumstances. Respondent does not dispute this premise, and both parties agree that section 288.5 punishes a continuous course of conduct. (*People v. Grant* (1999) 20 Cal.4th 150, 159.) "'A continuous course of conduct offense cannot logically be "completed" until the last requisite act is performed. Where an offense is of a continuing nature, and the conduct continues after the enactment of a statute, that statute may be applied without violating the ex post facto prohibition.' [Citation.]" (*Ibid.*, quoting *People v. Palacios* (1997) 56 Cal.App.4th 252, 257.) Thus, there can be no ex post facto violation so long as at least one of the acts constituting the

---

**6**     "[S]ection 288.5 defines the crime of continuous sexual abuse of a child. Any person who either resides in the same home with a minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with the child or three or more acts of lewd or lascivious conduct, is guilty of the offense of continuous sexual abuse. [Citations.]" (*People v. Johnson* (2002) 28 Cal.4th 240, 242.)

18

violation of section 288.5 occurred after the effective date of the increased punishment. (See *People v. Alvarez, supra*, 100 Cal.App.4th at p. 1179 [rape of one of multiple victims committed after effective date of One Strike law].)  In this case, that means that at least one of the acts constituting the continuous sexual abuse of A. must have been committed after September 20, 2006.

A conviction of section 288.5 does not require proof of the specific dates the offenses occurred, so long as the victim can "describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable [period alleged in the information]."  (*People v. Jones* (1990) 51 Cal.3d 294, 316.)  Such testimony may be sufficient to support a conviction under section 288.5; however, "[b]ecause such testimony may fail to establish when the acts underlying the charges occurred, serious problems with the ex post facto application of newly enacted sentencing statutes may arise."  (*Hiscox, supra*, 136 Cal.App.4th at p. 256.)

Here, as in *Hiscox*, the prosecution asked the witnesses to describe only the broad time period when the molestation occurred; further, the court did not instruct the jury that it must find that the offenses were committed on or after a date certain, and the jury made no such finding.  (*Id.* at p. 258.)  In such a case, reversal is required "unless the evidence leaves no reasonable doubt that the underlying charges pertained to events occurring" after the effective date of the statute.  (*Id.* at p. 261, citing *Chapman v. California* (1967) 386 U.S. 18, 24; see also *People v. Riskin* (2006) 143 Cal.App.4th 234, 244-245.)

Respondent contends that although some of the acts of sexual abuse were perpetrated on A. prior to September 20, 2006, the evidence established that at least one act constituting a violation of section 288.5 occurred between that date and October 23, 2007, the end date alleged in the information.  According to the timeline respondent has constructed from the evidence, defendant lived in Downey and Norwalk between September 20, 2006 and October 23, 2007.  During that time, A. paid overnight visits at

each home, and defendant touched her inappropriately in both places.[7] Adding that the last time defendant molested A. was in 2008, when A. was 12, respondent concludes that defendant's abuse was continuous between 2006 and 2008, including the period between September 20, 2006 and October 23, 2007.

We must reject any suggestion in respondent's mention of the 2008 abuse that acts occurring after October 24, 2007, might be considered part of the continuous sex abuse alleged in count 18. Count 19 alleged that the conduct occurring between October 24, 2007 and October 23, 2008, violated section 288, subdivision (a), and that same conduct could not be used to satisfy the elements of count 18. (See § 288.5, subd. (c).) Count 19 was not charged in the alternative, thus allowing a conviction of both counts; but if the dates overlapped, a conviction of both counts would have required the dismissal of count 19. (See *People v. Johnson, supra*, 28 Cal.4th at pp. 242-243, 248.) Thus, as defendant was convicted of both counts, offenses committed in 2008 cannot be used to establish that the count 18 offense continued after September 2006.

Although respondent has also shown that defendant abused A. in 2006 and 2007, that evidence does nothing to narrow the timeline to the requisite period. Gloria testified that she and her family moved to Arizona in 2006, but she did not say what month or even what season it was in 2006. No other testimony was elicited regarding when in 2006 A. and her family moved to Arizona, but A. testified she was still nine years old. As A.'s birth date was October 24, 1996, she was nine years old until October 23, 2006, leaving a *possibility* that A. may have spent one or more overnight visits at defendant's home after September 20, 2006. Gloria testified that after the move to Arizona, A. paid overnight visits at defendant and Marisol's home for Christmas 2007, in May 2009,

---

**7**      Respondent claims that defendant also lived in Lynwood in 2006, but the cited testimony does not bear that out. Gloria and A. both testified that they lived in the Lynwood house just before moving to Arizona in 2006. Viviana testified that Gloria lived in the back house, while their mother lived in the front house. It is unclear from the record when defendant lived in the Lynwood house. His daughter Rebecca, whose birth date was January 11, 1993, testified that he lived in the Lynwood house when she was in the fifth grade, which would probably have been in 2004 or 2005.

20

during the summer of 2008, and in the spring of 2009. No witness testified that A. visited at any time between the move to Arizona and October 23, 2007. Evidence which merely raises a possibility does not support a factual inference beyond a reasonable doubt. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

Defendant contends that none of the incidents occurring after the move to Arizona, even if shown to be in the requisite time period, could satisfy a required element of section 288.5, and thus avert an ex post fact violation. He explains that after the move, defendant could no longer have been a "person who either resides in the same home with the minor child or has recurring access to the child . . . ," because "recurring access" means something more than "transient" access. (*People v. Avina* (1993) 14 Cal.App.4th 1303, 1311.) We need not explore defendant's hypothesis, as we are unable to conclude that "the evidence leaves no reasonable doubt" that at least one offense took place after the effective date of the amendment of the One Strike law. (*Hiscox*, *supra*, 136 Cal.App.4th at p. 261.) We must therefore remand count 18 for resentencing. (*Ibid.*; see also *People v. Alvarez, supra*, 100 Cal.App.4th at p. 1178.)

## II. Counts 1, 2, and 3: ex post facto

Defendant contends that the One Strike sentences on counts 1, 2, and 3 were also prohibited by the ex post facto doctrine. This contention lacks merit, as we explain.

Counts 1, 2, and 3 charged defendant with committing a lewd act on V., a child under the age of 14 years, in violation of section 288, subdivision (a). The jury found defendant guilty of all three counts, and found true the allegation as to each that defendant had committed a violation of section 288, subdivision (a), or section 288.5, subdivision (a), on more than one victim. Accordingly, the trial court sentenced defendant under the One Strike law, section 667.61, subdivision (b).

Counts 1 and 2 alleged that the crimes were committed in 2003, 2004, and 2005. Count 3 was committed between January 18, 2005 and January 17, 2006. Prior to September 20, 2006, section 667.61, subdivision (b), provided for a life term with a minimum parole eligibility period of 15 years for offenses enumerated in subdivision (c) when there was a multiple victim finding. (See Stats. 1998, ch. 936, § 9, eff. Sept. 28,

21

1998.)  One Strike punishment was thus in effect at the time of defendant's crimes; however, defendant argues that another provision of the law excepted him from One Strike sentencing.  Section 667.61, subdivision (c)(7), provided that the One Strike term applied to a "violation of subdivision (a) of Section 288, unless the defendant qualifie[d] for probation under subdivision (c) of Section 1203.066." (Stats. 1998, ch. 936, § 9, eff. Sept. 28, 1998.)  Under the version of section 1203.066 in effect through December 31, 2005, that statute provided in relevant part:  "(a) [P]robation shall not be granted to . . . any of the following persons:  [¶] . . . [¶] (7) A person who is convicted of committing a violation of Section 288 or 288.5 against more than one victim." (Stats. 1997, ch. 817, § 13.)

Former section 1203.066 provided a "narrow exception" to the ban on probation for a multiple victim molester if the trial court made the five findings enumerated in subdivision (c).  (*People v. Wutzke* (2002) 28 Cal.4th 923, 927-928.)**[8]**  Under the amendment effective January 1, 2006, and under the current version of the statute, section 1203.066, subdivision (c), provides, as relevant here, that section 1203.066 is applicable only if the multiple victim allegation was pled and either admitted by the defendant in open court or found to be true by the trier of fact.  Under the amendment, probation could then be granted only upon enumerated conditions, essentially the five conditions found in the former statute.  (§ 1203.066, subd. (d)(1); Stats. 2011, ch. 296, § 216; Stats. 2005, ch. 477, § 5.)  Here, the multiple victim circumstance was alleged in the information and

---

**8**     The findings were as follows:  "(1) The defendant is the victim's natural parent, adoptive parent, stepparent, relative, or is a member of the victim's household who has lived in the victim's household.  [¶] (2) A grant of probation to the defendant is in the best interest of the child.  [¶] (3) Rehabilitation of the defendant is feasible, the defendant is amenable to undergoing treatment, and the defendant is placed in a recognized treatment program designed to deal with child molestation immediately after the grant of probation or the suspension of execution or imposition of sentence.  [¶] (4) The defendant is removed from the household of the victim until the court determines that the best interests of the victim would be served by returning the defendant to the household of the victim. . . .  [¶] (5) There is no threat of physical harm to the child victim if probation is granted."  (Former section 1203.066, subd. (c); Stats. 1997, ch. 817, § 13.)

22

found true by the jury. Thus, the probation exception was effectively eliminated by application of the amended statute.

Defendant contends that due to the exception available under former section 1203.066, probation was not "categorically" barred, and that he was thus eligible for probation until the law changed on January 1, 2006. Defendant contends that because the trial court *could have* exercised discretion to grant probation under the prior law, and because the prosecution did not plead or prove his ineligibility under the exception, he qualified for probation until proven otherwise, thus making the One Strike law inapplicable to him. Defendant bases his reasoning in part on *People v. Anderson* (2009) 47 Cal.4th 92, 102-103, which held that the truth of one of the aggravating circumstances underlying One Strike sentencing must be decided by a jury. In this case, that means that the jury was required decide the truth of multiple victim circumstances. (See *People v. Carbajal* (2013) 56 Cal.4th 521, 536; former § 667.61, subd. (c)(7).) Defendant concludes that disqualification from probation was also an aggravating circumstance the jury was required to decide.

Defendant's premise is faulty, as the prosecution is not required to allege the *absence* of a sentencing factor, and thus eligibility for probation was not a circumstance the prosecution was required to disprove. (*People v. Woodward* (2011) 196 Cal.App.4th 1143, 1152.) The burden was on defendant to establish the five criteria in section 1203.066, subdivision (c). (See *People v. Wutzke*, *supra*, 28 Cal.4th at p. 932; *People v. Groomes* (1993) 14 Cal.App.4th 84, 89.) Defendant did not meet his burden to show that he qualified for probation. He did not request probation, and submitted no evidence or argument relating to the five criteria for the probation exception. As he did not qualify for probation, he was subject to One Strike sentencing under the law in effect at the time he committed his crimes. (See former § 667.61, subd. (b); Stats. 1998, ch. 936, § 9; former § 1203.066, subd. (c); Stats. 1997, ch. 817, § 13.)

In any event, "'[f]inding a defendant ineligible for probation is not a form of punishment, because probation itself is an act of clemency on the part of the trial court.' [Citation.]" (*People v. Woodward, supra*, 196 Cal.App.4th at p. 1152, quoting *People v.*

23

*Benitez* (2005) 127 Cal.App.4th 1274, 1278.) As ineligibility for probation was not a form of punishment, the elimination of the probation exception did not create the possibility of inflicting greater punishment. We reject defendant's argument that the elimination of the probation exception is comparable to the circumstances in *People v. Delgado* (2006) 140 Cal.App.4th 1157, 1171, in which the appellate court held that a statute that transformed a discretionary condition of probation in domestic violence cases into a mandatory condition had the effect of increasing the penalty for the crime, and thus could not be applied retroactively. A more onerous condition of probation is not comparable to probation eligibility. (*People v. Woodward*, *supra*, at p. 1152.) As the elimination of the probation exception did not increase the penalty for defendant's crime, we conclude that defendant's sentence on counts 1, 2, and 3 would not violate ex post facto principles under either version of the statute. (See *Collins v. Youngblood*, *supra*, 497 U.S. at pp. 42-43.)

## III. Count 4

Count 4 alleged a separate violation of section 288, subdivision (a), with multiple victims, occurring between January 18, 2006 and January 17, 2007. Defendant's contention that his One Strike sentence violates the ex post facto clause is also based upon his assumption that he qualified for probation under the pre-2006 statute until such time as the prosecution proved otherwise.[9] We concluded in the last section that defendant was not eligible for probation unless and until he proved that he came within a narrow exception to his ineligibility. We also concluded that because ineligibility for probation is not a form of punishment, the elimination of the probation exception did not create the possibility of inflicting greater punishment, and the ex post facto doctrine did not require sentencing under the prior law. We reach the same conclusion here and reject defendant's challenge to count 4.

---

[9] As we read defendant's argument, he contends that his right to be sentenced under preexisting law became fixed at the time he committed the offense against V. as alleged in count 4, because there were no multiple victims at the time that he was eligible for probation under the prior law.

## IV. Disclosure of juror information

Defendant contends in the heading to this point that the trial court erred in refusing to set a hearing on his request to release juror information or to grant a continuance to permit him to file a written motion. In the body of his argument, however, defendant also contends that the trial court abused its discretion in denying his motion to release juror information.

A request for the release of juror identifying information may be made by petition supported by a declaration of facts sufficient to establish good cause for disclosure. (Code Civ. Proc., § 237, subd. (b).) "[W]here the trial court is presented with a credible prima facie showing that serious misconduct has occurred, the trial court may order jurors to appear at a hearing and to answer questions about whether misconduct occurred." (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 385-386 (*Tuggles*).)

At the time set for sentencing and hearing on defendant's motion for new trial, defense counsel requested a continuance to file a written petition to disclose juror information. Counsel stated that he had sent inquiries to eight jurors, but was not certain that the addresses were correct, and had heard back from only two of them. One declined to be interviewed, and he had only that morning been able to speak with the other juror, Juror No. 2, who voluntarily came to court and was prepared to provide a declaration regarding alleged juror misconduct. The prosecutor suggested that in lieu of a continuance, the court hear the juror's testimony, and defendant agreed. After the juror's testimony, defense counsel acknowledged that he could not present additional evidence of the misconduct without first having access to the other jurors, and he renewed his request for a continuance to file a written motion. The trial court heard further argument from both counsel, and then ruled that defendant had not made a prima facie showing of good cause for either a continuance or disclosure of juror information.

Contradicting his contention that the trial court erred in denying a continuance, defendant states that his request for a continuance to prepare a formal motion was moot when the trial court denied his oral motion to release juror information. We observe that not only was defendant's request for a continuance moot, there was no longer any need

25

for an evidentiary hearing. Defendant was afforded the opportunity to make the required prima facie showing through testimony rather than in a written declaration, and live testimony is "a more reliable means [than affidavits] of determining whether misconduct occurred." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 417.) The purpose of a hearing is to resolve any material conflicts presented by the evidence. (*Id.* at p. 419.) Defense counsel acknowledged that he had no additional evidence to support the motion unless the court first granted it and disclosed juror information so that he could determine whether there was additional evidence. As the trial court did not grant the motion, the only witness at a subsequent evidentiary hearing would be Juror No. 2, with no conflicts to resolve. Under such circumstances, the court was not required "to engage in pointless repetition of the hearing on juror misconduct." (*Tuggles, supra*, 179 Cal.App.4th at p. 388.) Nor is the appellate court required to order such "'a useless and futile act [which] would be of no benefit [defendant].' [Citation.]" (*Ibid.*)

Thus, defendant was given his opportunity to demonstrate good cause for the release of juror identification information. Code of Civil Procedure section 237, subdivision (b), required defendant to make a showing sufficient to support a reasonable belief that jury misconduct occurred, "'and that further investigation [was] necessary to provide the court with adequate information to rule on a motion for new trial. . . .' [Citation.]" (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1093-1094, quoting *People v. Rhodes* (1989) 212 Cal.App.3d 541, 552.)

To support a petition to disclose juror identification information, the misconduct alleged must be "'of such a character as is likely to have influenced the verdict improperly.' [Citation.]" (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322 (*Jefflo*).) Further, the petition must be supported by more than mere speculation and may not be used as a "'fishing expedition[]' by parties hoping to uncover information to invalidate the jury's verdict." (*People v. Rhodes, supra*, 212 Cal.App.3d at p. 552.) "Discovery of juror names, addresses and telephone numbers is a sensitive issue which involves significant, competing public-policy interests." (*Id.* at p. 548.) "Trial courts have broad discretion to manage these competing interests by allowing, limiting, or denying access to

26

jurors' contact information. [Citations.]" (*Tuggles, supra*, 179 Cal.App.4th at p. 380.) We review for abuse of discretion the trial court's ruling that the moving party failed to make a prima facie showing of good cause to unseal juror information. (*Townsel v. Superior Court, supra*, 20 Cal.4th at p. 1096.) We uphold the court's discretion unless it was arbitrary or capricious. (*People v. Santos* (2007) 147 Cal.App.4th 965, 978.)

Juror No. 2 testified that two jurors mentioned that defendant had not testified. There was no discussion, but she and another juror merely said, "I wonder why Mr. Ortiz didn't take the stand." Juror No. 2 did not recall any response to the comments or whether anyone else made a comment. Juror No. 2 remembered just one occurrence in the course of deliberations. No one commented that the jurors were not supposed to discuss this topic.

Among other instructions relating to the right not to testify, the trial court instructed the jury: "You must not draw any inference from the fact that a defendant does not testify. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way." As there were just two isolated comments regarding defendant's decision not to testify without any discussion of the matter, we cannot find that the jury disregarded the instructions by permitting the comments "to enter into" the deliberations. However, assuming the comments did amount to a violation of the court's instructions, they were hardly "'of such a character as is likely to have influenced the verdict improperly.'" (*Jefflo, supra*, 63 Cal.App.4th at p. 1322.) "Transitory comments of wonderment and curiosity' about a defendant's failure to testify, although technically misconduct, 'are normally innocuous, particularly when a comment stands alone without any further discussion.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 726-727, quoting *People v. Hord* (1993) 15 Cal.App.4th 711, 727-728.)[10]

_____

**10**　　After this case had been fully briefed and both sides had waived oral argument, defendant brought a newly published case, *People v. Johnson* (2013) 222 Cal.App.4th 486 (*Johnson*) to our attention, claiming that it held that a juror's comment on defendant's failure to testify requires granting a motion for disclosure of juror information, even if the jurors did not discuss the matter. The *Johnson* court did not so hold, and there is little similarity between this case and the cited case. There, the facts

Defendant contends the statements were not innocuous because Juror No. 2 testified that there *might* have been more than two jurors who raised the topic, and the topic *might* have been raised more than once, but she did not recall. Defendant argues that "[t]he very purpose of disclosing juror information in this case would be to determine whether the misconduct was even deeper than [Juror] No. 2 could specifically recall." Defendant's argument describes mere speculation and advocates a "fishing expedition" rather than demonstrating good cause to disclose juror identification information. (*People v. Rhodes, supra*, 212 Cal.App.3d at p. 552.)

Defendant also argues that when two people expressly wonder why defendant did not testify, that constitutes a discussion rather than two "fleeting" comments as the trial court found. The trial court's description of the comments as fleeting does not demonstrate that the trial court's determination was arbitrary or capricious. We conclude that as defendant failed to make a prima facie showing of good cause for disclosure, the trial court's ruling was not an abuse of discretion.

## V. New trial motion based on juror misconduct

Defendant contends that the trial court erred in denying his motion for new trial based upon the misconduct described by Juror No. 2. As respondent observes, defendant did not bring a motion for new trial on this ground. Juror misconduct was not mentioned in defendant's written motion for new trial, and defendant's trial counsel expressly submitted the matter on the written motion.

"A motion for new trial may be granted only upon a ground raised in the motion. [Citations.]" (*People v. Masotti* (2008) 163 Cal.App.4th 504, 508.) When a new trial motion is based upon juror misconduct, the trial court undertakes a three-step analysis to determine whether the supporting evidence is admissible, whether it establishes

---

suggested a discussion among the jurors: the defendant's stepfather claimed that a juror told him that "'at least half of the jurors . . . raised the question if he is innocent why he didn't take the stand to defend himself.'" (*Johnson, supra*, at p. 491.) Here, by contrast, there were simply two comments expressing curiosity about defendant's failure to testify, without connecting it to the issue of guilt, and Juror No. 2 expressly testified that there was no discussion. We found *Johnson* to be inapposite.

misconduct, and finally, whether the misconduct was prejudicial. (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1467.) The trial court did not make this analysis because defendant did not base his motion on this ground. A trial court does not err "in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.) Further, whether to grant a motion for new trial rests within the discretion of the trial court (*People v. Howard* (2010) 51 Cal.4th 15, 42), and a court cannot be found to have abused a discretion it was never asked to exercise. (See *People v. Burns* (1987) 196 Cal.App.3d 1440, 1455.)

In reply, defendant asserts that the trial court must have understood from defense counsel's comments in the hearing on his motion to disclose juror information that he was making an oral motion for new trial on the same grounds. On the contrary, counsel's comments made clear to the court that the very reason he sought disclosure was that he did not have sufficient evidence of juror misconduct to bring a motion for new trial on this ground.

Defendant also contends that defense counsel expressly incorporated the juror misconduct issue into his new trial motion when he said, after submitting the new trial motion on the papers, "Well, I'll hold my comment on the court's prior ruling to the appeal, but I've stated what I need to state and I just want to say that the witness did not say for sure it wasn't discussed. She doesn't recall and it came up." We reject defendant's characterization of the comment as incorporating the issue of juror misconduct into the motion for new trial; it appeared to have been no more than an afterthought on the prior ruling.

We find no merit to defendant's contentions that prejudice was presumed from the juror misconduct, or to the contention that a new trial was required on that ground. A presumption of prejudice arises only after the complaining party establishes serious misconduct of a type likely to have had an effect on the verdict. (*In re Carpenter* (1995) 9 Cal.4th 634, 652 (*Carpenter*).) We have already determined that although the two comments were technically misconduct, the evidence showed that they were not "'of such a character as is likely to have influenced the verdict improperly.'" (*Jefflo, supra*,

29

63 Cal.App.4th at p. 1322.) Further, had the comments been serious enough to presume prejudice, any such prejudice was rebutted by evidence that they were brief, isolated, and not discussed. (See *People v. Loker* (2008) 44 Cal.4th 691, 749 (*Loker*) [short discussion ensued but ceased when offending juror was reminded he could not consider defendant's failure to testify].)**11**

Defendant contends that regardless of whether the presumed prejudice was rebutted, a review of all the evidence shows the juror misconduct was prejudicial and requires reversal. To determine whether juror misconduct was prejudicial, we apply an independent standard of review to determine whether there was a substantial likelihood of actual bias, either because the misconduct was inherently prejudicial, or because the nature of the misconduct and an examination of the "totality of the circumstances surrounding the misconduct" shows a substantial likelihood of actual bias. (See *Carpenter, supra*, 9 Cal.4th at pp. 653-654.)

Because we have found that the misconduct was neither serious nor of a type likely to have had an effect on the verdict it was not inherently prejudicial; and upon examining the record and the totality of the circumstances, we find no substantial likelihood of actual bias. (*Carpenter, supra*, 9 Cal.4th at pp. 652-653.) First, the jury acquitted defendant of some counts of abuse against V. If the jury had based its decision on defendant's failure to testify it is more likely that it would have convicted defendant of all counts. This raises a strong inference that the jury weighed all the evidence and was not improperly influenced by two improper comments. To support his argument to the contrary defendant relies on cases that do not hold otherwise or even bear on that issue. (See, e.g., *People v. Lonergan* (1990) 219 Cal.App.3d 82, 94-95; *People v. Epps* (1981) 122 Cal.App.3d 691, 698.)

---

**11** Defendant attempts to distinguish *Loker* because the offending juror was admonished. We nevertheless find it instructive as the two comments were less egregious here, and since none of the other jurors replied to the comments, there was no discussion requiring admonishment.

Defendant also argues that because the jury was deadlocked in his first trial, the evidence must have been weak in this trial, thus suggesting that the verdicts were based on bias caused by the two comments. Defendant relies on *People v. Brooks* (1979) 88 Cal.App.3d 180, 188, disapproved on another point in *People v. Mendoza* (2011) 52 Cal.4th 1056, 1086, which neither reached nor discussed any similar contention. Furthermore we decline to speculate why the jury was deadlocked in the first trial.

In any event the evidence was not weak. We agree with respondent that the case against defendant was sufficiently strong and compelling as to demonstrate that it was not reasonably likely that the misconduct influenced the verdict. (See *Carpenter, supra*, 9 Cal.4th at p. 654.) The evidence of similar abuse against the three victims established defendant's disposition to sexually abuse young children. (See *People v. Reliford* (2003) 29 Cal.4th 1007, 1011; Evid. Code, § 1108.) In addition, V.'s claims were amply corroborated by the testimony of other witnesses. Edgar testified that during an incident that frightened him, he woke up, listened for 20 minutes to shuffling noise coming from the area of V. and defendant, and as he came out the bathroom a short time later, he saw V. with her pants unzipped. Edgar also saw defendant pull down V.'s bikini bottom during a swimming pool game in which she had not been participating. Alyssa testified that she saw defendant put his hand around V.'s buttocks, and another time, she saw him place his hand on V.'s upper thigh near her vagina and rub it up and down in a caressing motion. Edgar and Rebecca both testified they had noticed that defendant showed greater affection toward V. and A., and that V. appeared to be his favorite among all the nieces and nephews.

Defendant argues that we should give no weight to the testimony of other witnesses because they provided only circumstantial evidence, and as jurors are generally skeptical of circumstantial evidence (see *People v. Santana* (2000) 80 Cal.App.4th 1194, 1208), it was probably not considered. He also suggests that the jury relied on defendant's failure to testify rather than V.'s testimony, because she was not credible, as demonstrated by internal conflicts in her testimony, gaps in her memory, rebellious

31

behavior, uncorroborated testimony that defendant engaged in bestiality, and the failure of law enforcement to find the dildo defendant used on her.

Defendant's discussion suggests that we should reweigh the evidence and make an independent determination of the credibility of witnesses. However, if the trial court did, in fact, consider and deny a motion for new trial on the basis of juror misconduct, as defendant has insisted, we independently review only questions of law; we must accept the trial court's factual findings and credibility determinations. (*People v. Nesler* (1997) 16 Cal.4th 561, 582.) Thus, we decline to determine prejudice by disregarding circumstantial evidence, by resolving conflicts, or by relying on defects in V.'s memory of events which took place over a period of years or rebellious or other bad behavior V. displayed as a teenager.

Further, the jurors were well instructed in how to evaluate circumstantial evidence and the credibility witnesses, including child witnesses, and how to resolve conflicts in testimony. As there is no indication in the record that the jury disregarded these instructions, we presume that the jury understood and followed them. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

We conclude that as there was no substantial likelihood of actual bias as a result of the two comments, defendant's motion for new trial on the ground of juror misconduct would have been properly denied if brought on that ground. There was no error.

## VI. Expert testimony

Defendant contends that the trial court improperly restricted the testimony of defense expert Dr. Whiting regarding CSAAS. In particular, defendant contends: (1) that the court prevented Dr. Whiting from explaining his opinion that "delayed disclosure is consistent with both true and false allegations of abuse"; (2) that the court prevented Dr. Whiting from testifying that the CSAAS model described by Dr. Bernfeld was based on obsolete science and no longer considered valid by the scientific community; and (3) that the trial court erroneously excluded testimony to the effect that "social or cultural circumstances that may have discouraged disclosure in the past . . . might no longer be generally applicable."

32

"[E]xpert testimony on the common reactions of child molestation victims . . . is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident -- e.g., a delay in reporting -- is inconsistent with his or her testimony claiming molestation. [Citations.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300; see also *People v. Bowker* (1988) 203 Cal.App.3d 385, 390-394.) "It is beyond dispute that CSAAS testimony is inadmissible to prove that a molestation actually occurred. It can be highly prejudicial if not properly handled by the trial court. It is unusual evidence in that it is expert testimony designed to explain the state of mind of a complaining witness. The particular aspects of CSAAS are as consistent with false testimony as with true testimony. For these reasons, the admissibility of such testimony must be handled carefully by the trial court. [Citations.]" (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744.)

A defendant may call his own expert on CSAAS, and we review the admission or exclusion of such testimony for abuse of discretion. (*People v. Wells* (2004) 118 Cal.App.4th 179, 186.) It is the defendant's burden to demonstrate that the trial court's decision was irrational, arbitrary, or not "'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' [Citation.]" (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.)

A judgment may not be reversed due to an erroneous exclusion of evidence unless the reviewing court finds that the exclusion has resulted in a miscarriage of justice and the record shows that "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means." (Evid. Code, § 354, subd. (a).) Appellate review of the exclusion of evidence is limited to the points made in the appellant's offer of proof in the trial court. (*People v. Benavides* (2005) 35 Cal.4th 69, 94.)

Defendant makes no cogent argument regarding offers of proof. Of the three items of excluded testimony, the only offer of proof made by defense counsel was made in the sidebar discussion regarding the prosecutor's objection to the following question: "Is the fact a person delayed reporting inconsistent with them having been abused?"

Defendant does not describe his offer of proof, but contends that the sidebar resulted in the exclusion of testimony regarding scientific literature that would explain Dr. Whiting's opinion that delayed disclosure was consistent with both true and false allegations. He contends that this was error which prevented him from effectively refuting Dr. Bernfeld's testimony that most children do not disclose sex abuse immediately and the majority never disclose; and this "raised the risk that the jury would erroneously treat delayed disclosure as affirmative evidence of abuse."

Our review of that sidebar discussion reveals no indication that Dr. Whiting intended to testify that studies had refuted those cited by Dr. Bernfeld regarding the percentage of children who delay disclosure or who never disclose. As respondent points out, defense counsel represented that Dr. Whiting would discuss actual studies of particular delayed reporting cases where abuse had not occurred. The prosecutor objected to the admission of specific instances of fabrication, and trial court ruled that counsel would not be permitted to "go into studies, etcetera." The court told counsel he would be allowed only to ask whether delayed disclosure was consistent with both true and false allegations of abuse. Dr. Whiting then gave his opinion that the behavior cited in the Summit model would be consistent with a child who had been abused if it were assumed that the abuse had occurred, and would also be consistent in some cases where a child had not been abused, but was fabricating.

Defendant makes no mention here of studies of individual children who have lied about abuse, as he did in his offer of proof. He contends that the proposed testimony would have been narrowly limited to the scope and limits of CSAAS, but does not explain how individual cases of fabrication would be relevant to the scope and limits of CSAAS. Further, although defendant contends that the excluded testimony violated his right to present a defense, he fails to explain or even discuss why studies of children who have been found to have fabricated abuse claims was vital to his defense.

Nor have we found an offer of proof regarding obsolete science. Indeed, defendant does not contend that Dr. Whiting was ever specifically asked whether the Summit model was based on obsolete science. Nevertheless, defendant contends that the

34

issue was raised when defense counsel posed the following question to Dr. Whiting: "And how, in your opinion, has the [CSAAS] been misused since Dr. Summit first proposed it?" Defendant contends that the trial court erroneously sustained the prosecutor's relevance objection, but does not argue that the misuse of the model by others was relevant in this case. Instead, defendant argues the relevance of an entirely different issue, whether the model was still credited by the scientific community.

Defendant contends that prejudice is demonstrated here because the excluded testimony was "the only significant difference" between this trial and the first trial which resulted in a hung jury. Defendant has caused the record to be augmented with Dr. Whiting's testimony in the first trial to the effect that the model has been misused and that a more supportive and believing culture makes it more likely that children will report abuse today than 30 years ago when the Summit model was created. However, defendant's prejudice analysis is incomplete and without merit. We agree with respondent that defendant's asserted reason for the hung jury in the first case is speculative. Defendant has made no attempt to undertake a comparative review of all the evidence in the two trials to demonstrate that this evidence was "the only significant difference" between the two.

Moreover, defendant has not shown that the evidence was erroneously excluded, or even that the obsolete science testimony was proffered at all in the second trial. Indeed Dr. Whiting testified that the Summit model was helpful in understanding delayed disclosure in proven cases of abuse, suggesting that it was not obsolete. Defendant has also not shown that misuse of the model in other cases had any relevance in this case, particularly where the model was not, in fact, misused. Both Dr. Whiting and Dr. Bernfeld testified that the model was neither diagnostic nor predictive, and could not be used to determine whether a child was really abused. The trial court restricted the evidence to its appropriate use by instructing the jury with CALJIC No. 10.64, as follows:

> "Evidence has been presented to you concerning [CSAAS]. This evidence is not received and must not be considered by you as proof that

the alleged victim's molestation claim is true. [CSAAS] research is based upon [an] approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a molestation has occurred and seeks to describe and explain common reactions of children to that experience. As distinguished from that research approach, you are to presume the defendant innocent. The People have the burden of proving guilt beyond a reasonable doubt. You should consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested."

"It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) Thus, as the instructions clearly defined the proper use of CSAAS evidence and admonished the jury not to consider it as proof of defendant's guilt, we assume they did not treat it as affirmative evidence of abuse. (See *People v. Housley* (1992) 6 Cal.App.4th 947, 958-959.) We conclude that defendant has failed to show that the exclusion of any of Dr. Whiting's testimony was irrational, arbitrary, or erroneous under applicable legal principles, or that any such exclusion resulted in a miscarriage of justice. (See *People v. Superior Court (Alvarez), supra*, 14 Cal.4th at p. 977.)

## VII. Prosecutorial misconduct

Defendant contends that the prosecutor urged the jurors to make improper use of the CSAAS testimony, and that the prosecutor improperly argued that Marisol's absence from the courtroom was due to her lack of support for defendant, rather than the trial court's witness exclusion order. Defendant also contends that he did not forfeit this issue by failing to object, and that the misconduct was prejudicial.[12]

---

[12] As with his argument regarding juror misconduct and exclusion of expert testimony, defendant's prejudice argument is based on the fact that the first trial ended in a hung jury. Defendant contends that the Supreme Court enunciated the "rule" (as he describes it), that "an error is prejudicial if there was a deadlock in the first trial without the error, and a conviction in the second trial with the error." He relies on *People v. Gonzalez* (2006) 38 Cal.4th 932, 962, which enunciated no such rule. In that case, a prior penalty trial resulted in a hung jury after that defendant had presented mitigating

Defendant failed to object to the argument or request an admonition. "In order to preserve a claim of prosecutorial misconduct for appeal, the defense must make a timely objection at trial and request an admonition. [Citations.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1146.) The claim is reviewable only if an admonition would not have otherwise cured the harm caused by the misconduct. (*Ibid*.) Defendant contends that he has not forfeited the issue because an admonition would not have dispelled any prejudice. Defendant also contends that there is no legitimate tactical reason for defense counsel not to have objected; thus review is necessary to forestall a claim of ineffective assistance of counsel.

We agree with respondent that defendant's claim of misconduct is without merit, preserved or not. "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Fry*e (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Defendant first contends that the following three excerpts from the prosecutor's arguments called for an improper use of the CSAAS evidence:

(1) "There are what I like to refer to as five stages of her victimization";

(2) "There's the sorrow, the burden that was part of the burden of keeping the secret"; and,

(3) "[V.] was 16 when she disclosed. And everything that you've learned about her emotional journey is similar to the journeys, the emotional journeys of children that

---

evidence that was not presented in the subsequent trial. The court found that it was "reasonably possible the verdict at the second trial would have been different had defendant presented similar mitigating evidence at the second trial." (*Ibid*.) The court's observation was not a rule capable of general application.

37

have been studied, who they know because of physical evidence were sexual abuse victims."

Defendant asserts that the prosecutor argued, in effect, that because V. fit the profile of children known to have been abused and that her emotional journey fit the five categories of the Summit model, the jury could infer that she shared the characteristics of a true victim and was thus likely to have been abused. The prosecutor was not discussing CSAAS, no one testified that the fifth category, retraction, was relevant here, and nothing in the quoted snippet of argument other than the number five relates to CSAAS. We thus reject defendant's invitation to "'lightly infer'" that the jury understood a damaging meaning in the prosecutor's statements. (*People v. Frye, supra*, 18 Cal.4th at p. 970.)

Defendant also complains that the argument left the jurors without "any doubt that CSAAS was a legitimate means to infer that V. was telling the truth." As respondent notes, the prosecutor made it abundantly clear in argument not quoted by defendant that the CSAAS evidence could not be used to infer that V. was telling the truth or as proof that the abuse occurred. Before making the challenged comments, the prosecutor told the jury:

> "There's been some testimony about [CSAAS]. The court has instructed you as to how you consider that evidence. What's most important is for you not to just immediately discredit her because there was a failure to disclose. This testimony from Dr. Bernfeld was not offered to you as a diagnostic tool. It's not a formula to decide whether or not she's telling the truth or not telling the truth."

Further, we reject defendant's argument that it would be improper to suggest that CSAAS evidence might assist jurors in evaluating V.'s credibility. The very purpose of the evidence is to rehabilitate the complaining witness's credibility after the defendant has suggested her behavior was inconsistent with a claim of sex abuse, as defendant did repeatedly over extensive cross-examination. (See *People v. McAlpin, supra*, 53 Cal.3d at p. 1300.)

There is an equal lack of merit in defendant's contention that the prosecutor impliedly commented on Marisol's absence from the courtroom when she argued,

"Where's Mari? What we do know is that when Anthony was sitting on that witness stand, his mother Mari was waiting outside in the hallway for him. She was here to support her children, but not her man?" In the following comments missing from defendant's argument, the prosecutor made it very clear that she was questioning why Marisol did not testify on her husband's behalf:

> "[T]he defense has a right to call [witnesses] and certainly you would expect a certain logical witness to testify. [Defense counsel] called Anthony, the defendant's son. Where's Mari? What we do know is that when Anthony was sitting on that witness stand, his mother Mari was waiting outside in the hallway for him. She was here to support her children, but not her man? Why wasn't she called to the witness stand? Did you ask herself [*sic*]? Why wasn't she called to say it never happened; it isn't so? I knew my husband. We had a regular sex life. He isn't a pervert. We had no problems in our marriage. I walked in that room in the middle night, never saw a thing. I would have heard it. Where is Mari? Isn't she the logical witness that you call when she's waiting outside in the hallway while her son is on the witness stand, the child is on the witness stand? Why isn't she here to support her man? Did you ever ask yourself that?"

"[P]rosecutorial comment upon a defendant's failure 'to introduce material evidence or to call logical witnesses' is not improper. [Citations.]" (*People v. Wash* (1993) 6 Cal.4th 215, 263.) In particular, the failure to call close relatives who could corroborate the defendant's testimony is relevant and may be brought out by the prosecutor. (*People v. Chatman* (2006) 38 Cal.4th 344, 403.) Here, it is only by quoting snippets of argument that defendant can argue that the prosecutor meant to imply something improper.[13]

If defendant had objected to the challenged remarks, the trial court would undoubtedly have overruled the objection, as there was no misconduct. Nor did counsel render ineffective assistance by not making unmeritorious objections. (See *People v.*

---

[13] Defendant also complains that he was not permitted to refute the prosecutor's comments by pointing out Marisol in the audience during summation. However, such a gesture would not have refuted the prosecutor's comment that Marisol did not testify.

*Gutierrez* (2009) 45 Cal.4th 789, 804-805.) Thus, we conclude that defendant did not preserve the issue for review, and we reject defendant's contentions on the merits.

## DISPOSITION

The sentence of 15 years to life on count 18 is vacated, and the matter is remanded for resentencing on count 18 to a term of imprisonment of 6, 12, or 16 years, under the law in effect prior to September 20, 2006. The conviction on count 18 is otherwise affirmed, and as to all remaining counts, the judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST